**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NATURAL RESOURCES DEFENSE
COUNCIL, INC.; THE INTERNATIONAL
FUND FOR ANIMAL WELFARE;
CETACEAN SOCIETY INTERNATIONAL;
LEAGUE FOR COASTAL PROTECTION;
OCEAN FUTURES SOCIETY; JEAN-
MICHEL COUSTEAU,
                    *Plaintiffs-Appellees,*

                v.

DONALD C. WINTER, Secretary of
the Navy; UNITED STATES
DEPARTMENT OF THE NAVY; CARLOS
M. GUTIERREZ, Secretary of the
Department of Commerce;
NATIONAL MARINE FISHERIES
SERVICES; WILLIAM HOGARTH,
Assistant Administrator for
Fisheries of the National
Oceanographic and Atmospheric
Administration; CONRAD C
LAUTENBACHER, JR., Administrator
of the National Oceanographic and
Atmospheric Administration,
                    *Defendants-Appellants.*

No. 07-56157

D.C. No.
CV-07-00335-FMC
Central District of
California,
Santa Ana

ORDER AND
OPINION

Filed August 31, 2007

Before: Andrew J. Kleinfeld, Consuelo M. Callahan, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Kleinfeld;
Dissent by Judge Milan D. Smith, Jr.

11899

## COUNSEL

Kathryn E. Kovacs and Allen M. Brabender, Appellate Section, U.S. Department of Justice, Environment & Natural Resources Division, Washington, D.C., for the federal defendants-appellants.

Richard B. Kendall, Alan J. Heinrich, and Gregory A. Fayer, Irell & Manella, LLP, Los Angeles, California; and Joel R. Reynolds, Andrew E. Wetzler, and Cara A. Horowitz, Natural Resources Defense Council, Santa Monica, California, for the plaintiffs-appellees.

## OPINION AND ORDER

KLEINFELD, Circuit Judge:

The Navy and environmental advocacy organizations have battled for years about whether Navy training using sonar is too harmful to the environment, particularly whales. The Navy uses something called medium frequency active sonar, which basically bounces a loud noise off the hulls of extremely quiet submarines to detect their presence. The loud noise may be quite harmful to whales and other marine mammals. In a previous round of this litigation, the district court had approved a settlement that allowed Navy sonar training to proceed, but required mitigation measures. The measures consisted of such precautions as requiring some sailors to be on deck looking for whales, and reducing the decibel level when whales were present, weather prevented seeing whether any whales were around, or "surface ducting" would let the noise carry more.[1]

In this round of the litigation, the Navy proposed to use medium frequency active sonar in training exercises off the coast of Southern California without mitigation measures. The record does not show why the Navy does not propose the mitigation measures it has previously used. The district court issued a preliminary injunction under the National Environmental Policy Act[2] and the Coastal Zone Management Act.[3] The injunction prohibits all use of medium frequency active sonar off the coast of Southern California during the fourteen large training exercises from 2007 to 2009.[4] The district court did not tailor the injunction in any way, such as by requiring

---

[1]*See NRDC v. Winter*, Settlement Agreement, CV-06-4131-FMC (C.D. Cal. July 7, 2006).

[2]42 U.S.C. §§ 4321-4347.

[3]16 U.S.C. § 1451 et seq.

[4]*NRDC v. Winter*, Order, CV-07-00335-FMC at 20 (C.D. Cal. Aug. 7, 2007).

the mitigation measures it had found sufficient before. The district court offers no more explanation of why the training could not be allowed to proceed with mitigation measures than the Navy does for why it does not want to commit itself to using mitigation measures. There is no explanation in the record for the breadth of the Navy's position or of the district court's injunction.

Medium frequency active sonar has proven to be the most effective method of detecting quiet-running diesel-electric submarines by emitting sound underwater at extreme pressure levels. The 2007 to 2009 exercises at issue were designed to train the full array of land, sea, undersea, and air components of the Pacific Fleet to perform successfully in complex, coordinated combat missions. An advocacy group, the Natural Resources Defense Council, and four other plaintiffs filed this action against the Navy, alleging that by finding no significant environmental impact after an environmental assessment, instead of preparing a full environmental impact statement, and by concluding that there was no effect on coastal resources, the Navy violated the National Environmental Policy Act,[5] the Endangered Species Act,[6] the Administrative Procedures Act,[7] and the Coastal Zone Management Act.[8] Finding that the plaintiffs had demonstrated a high probability of success on the merits of all claims save the Endangered Species Act claim and a "near certainty" of irreparable harm to the environment, the district court enjoined the Navy from using medium frequency sonar during the fourteen challenged SOCAL training exercises.[9] The Navy filed an emergency motion for stay of the injunction pending appeal, which we grant.

---

[5]42 U.S.C. §§ 4321-4347.

[6]16 U.S.C. § 1536.

[7]5 U.S.C. § 551 et seq.

[8]16 U.S.C. § 1451 et seq.

[9]*NRDC v. Winter*, Order, CV-07-00335-FMC (C.D. Cal. Aug. 7, 2007).

**[1]** Two standards affect our determination, the standard applicable to district courts for preliminary injunctions, and the standard for appellate courts for stays pending appeal. The district court must apply a four part standard, or a sliding scale. What is critical to our review for abuse of discretion[10] is that the district court must consider not only the possibility of irreparable harm, but also, in appropriate cases, the public interest. The public interest is not the same thing as the hardship to the party against whom the injunction was issued. Balance of hardships is the third factor, and the public interest is the fourth factor. They are separate:

> Under the traditional test, a plaintiff must show: (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a *balance of hardships* favoring the plaintiff, and (4) advancement of the *public interest* (in certain cases). The alternative test requires that a plaintiff demonstrate either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor. These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases. They are not separate tests but rather outer reaches of a single continuum.[11]

The district court was required to consider, not only "balance of hardships" as between the plaintiffs and the Navy as an Executive Branch agency, but also the "public interest" in having a trained and effective Navy. We customarily give

---

[10]*See Sports Form, Inc. v. United Press Int'l, Inc.*, 686 F.2d 750, 752 (9th Cir. 1982).

[11]*Taylor v. Westly*, 488 F.3d 1197, 1200 (9th Cir. 2007) (emphasis added).

considerable deference to the Executive Branch's judgment regarding foreign policy and national defense.[12]

[2] The Supreme Court in *Hilton v. Braunskill*[13] articulated the similar standard appellate courts are required to apply for stays of civil judgments pending appeal.[14] This standard requires us to consider "where the public interest lies" separately from and in addition to "whether the applicant [for stay] will be irreparably injured absent a stay:"[15]

> The factors regulating issuance of a stay [include]: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) *whether the applicant will be irreparably injured* absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) *where the public interest lies*.[16]

[12]*E.g.*, *Dep't of Navy v. Egan*, 484 U.S. 518, 529 (1988) (noting that "unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs."). The dissent argues that *Egan* was "not an environmental case" and that it relied heavily on "the President's authority as Commander in Chief." True, NEPA applies to the Navy, but that is not a distinction that makes a difference. There is no exception to the President's authority as Commander in Chief for environmental cases.

[13]*Hilton v. Braunskill*, 481 U.S. 770 (1987).

[14]The dissent accurately notes that *Hilton* involved a stay of a writ of habeas corpus, but erroneously argues that the *Hilton* standard would therefore not apply to an environmental case. The Court in *Hilton* says that it is using "the traditional standards governing stays of civil judgments" to interpret the rules for stays of writs of habeas corpus, *id.* at 774, and "the factors regulating the issuance of a stay are generally the same," *id.* at 776. That leaves no room for the dissent's position that they are not "generally the same" or that, as the dissent says, "*Hilton* does not apply here."

[15]*Id.* at 776.

[16]*Id.* (emphasis added); *see* Fed. R. Civ. P. 62(c); Fed. R. App. P. 8(a).

*Hilton* emphasizes that even "failing" a strong likelihood of success on the merits, the party seeking a stay may be entitled to prevail if it can demonstrate a "substantial case on the merits" and the second and fourth factors militate in its favor.[17] The district court did not give serious consideration to the public interest factor. All our dissenting colleague can come up with is an oblique reference in the oral discussion preceding the order. All the order contains is a conclusory remark about "the harm the Defendants will suffer." That is the third factor, not the fourth. There is not a word in the order about the interest of the public, as distinguished from the interest of the Navy, in war preparedness:[18]

> The Court is also satisfied that the balance of hardships tips in favor of granting an injunction, as the harm to the environment, Plaintiffs, and public interest outweighs the harm that Defendants would incur if prevented from using MFA sonar, absent the use of effective mitigation measures, during a subset of their regular activities in one part of one state for a limited period.[19]

The reference to "public interest" by the district court extends only to the interest in protecting marine mammals, especially beaked whales, not the interest in national defense.

[3] The public does indeed have a very considerable interest in preserving our natural environment and especially relatively scarce whales.[20] But it also has an interest in national defense. We are currently engaged in war, in two countries.

---

[17]*Hilton v. Braunskill*, 481 U.S. 770, 778 (1987).

[18]We reviewed classified documents submitted by the Navy to the district court and considered them in coming to our decision.

[19]*NRDC v. Winter*, Order, CV-07-00335-FMC at 19 (C.D. Cal. Aug. 7, 2007).

[20]The main argument of the dissent is that NEPA applies to the Navy. We do not disagree.

There are no guarantees extending from 2007 to 2009 or at any other time against other countries deciding to engage us, or our determining that it is necessary to engage other countries. The safety of the whales must be weighed, and so must the safety of our warriors. And of our country.

Our dissenting colleague also argues that "the Navy is free to proceed at any time with its MFA sonar training exercises *outside* the SOCAL area that are similar to conditions in the SOCAL area." The environmental assessment,[21] though, explains that "this particular location" matters.[22] According to that document, "[t]here is no duplicative location where land, sea, undersea and airspace assets are controlled by military authorities that allow full play and training by THIRD Fleet operational actors."[23] The environmental assessment further explains that none of the potential alternative locations, including Alaska and Hawaii, "provide the full complement of range infrastructure necessary to conduct typical, realistic, coordinated COMPTUEX and JTFEX training."[24] Although one-time training operations have been conducted off Alaska and Hawaii, the environmental assessment says that "routine usage of these training areas for the major exercises is infeasible."[25] Because the record offers no support for it, we respectfully disagree with our dissenting colleague's implication that the Navy ought to do whatever it needs to do someplace other than off the coast of Southern California.

**[4]** The district court did not explain why a broad, absolute

---

[21]United States Navy, Composite Training Unit Exercises and Joint Task Force Exercises, Environmental Assessment/Overseas Environmental Assessment, Final, *available at* http://www.navydocuments.com/documents/COMPTUEX-JTFEX%20EA-OEA.pdf (February 2007) (last visited Aug. 29, 2007).

[22]*Id.* at 2-32.

[23]*Id.*

[24]*Id.* at 2-33.

[25]*Id.*

injunction against the use of the medium frequency active sonar in these complex training exercises for two years was necessary to avoid irreparable harm to the environment. The district court's previous approval of similar exercises subject to mitigation measures requires some explanation, which we cannot find in the order granting the injunction, for why that is no longer sufficient. Nor does the Navy explain why it no longer proposes to use these mitigation measures, a factor that militates against its probability of full success on the merits in district court. On appeal, though, because of the breadth of the injunction, and the district court's failure to consider the fourth factor, the Navy's probability of at least partial success on the merits is high. At the least, the Navy presents a "substantial"[26] case on appeal, and the "second and fourth factors"[27] militate in its favor. Applying independently on appeal our duty under *Hilton*[28] to consider the fourth factor, the public interest, we are obligated to grant a stay pending appeal of the preliminary injunction.

Our conclusion is limited to what is before us, a district court injunction absolutely prohibiting the Navy's use of medium frequency active sonar in its training program rather than tailoring the injunction with mitigation measures. We do not suggest whether an injunction allowing the exercises but subjecting them to mitigation measures might lead to a different result, because no such injunction is before us. The environmental assessment says that there would be no significant environmental impact if the Navy used lookouts for marine mammals, made binoculars available to the lookouts, and reduced the noise during "surface ducting" conditions or when it was so foggy that the lookouts would not be able to see marine mammals.

---

[26]*See Hilton v. Braunskill*, 481 U.S. 770, 778 (1987).

[27]*See id.*

[28]*Id.* at 776.

Expeditious determination of this appeal can eliminate a great deal of the risk to both our country and to marine wildlife. Accordingly, we order expedited briefing and calendaring of this appeal. The provisions of Ninth Circuit rule 31-2.2(a) shall not apply to this appeal. A briefing schedule is set out in a separate order. Any motions to extend time to file the briefs will be strongly disfavored.

The Navy's emergency motion to stay the preliminary injunction entered by the district court on August 7, 2007 is GRANTED.[29]

---

MILAN D. SMITH, JR., Circuit Judge, dissenting in part and concurring in part:

I respectfully dissent to the granting of a stay of the district court's preliminary injunction. The district court did not abuse its discretion when it issued a preliminary injunction against the Navy's use of MFA sonar during certain planned exercises in the SOCAL range through January 2009.

The Navy has not shown a probability of success on the merits of this case or raised serious questions about the merits. In weighing the possibility of irreparable injury, balancing hardships, and determining where the public interest lies, the district court carefully considered and weighed the national security and public interest issues presented by this case. Until very recently, the Navy employed some environmental mitigation measures it now rejects in the name of national security. Moreover, the Navy has the ability to continue training its

---

[29]Natural Resources Defense Council's motion to strike the "Unclassified Declaration Addendum of David Yoshihara," submitted by Defendants-Appellants with their reply brief, is GRANTED, because it contains new evidence not presented to the district court. *See* Fed. R. App. P. 10(a). All other motions are referred for consideration to the merits panel.

personnel in the use of MFA sonar technology pending the outcome of the merits of this case by conducting MFA sonar exercises *outside* the SOCAL range. In fact, the district court received evidence that the Navy is testing MFA sonar technology "all over the world all the time." It is the Navy's sharp starboard tack from its recent training practices that has left it in irons fighting environmental laws, not a failure by the district court to consider national security or the public interest.

On appeal, we review the issuance of a preliminary injunction for abuse of discretion. *Ashcroft v. ACLU*, 542 U.S. 656, 664 (2004). Under the abuse of discretion standard, a reviewing court cannot reverse absent "a definite and firm conviction that the district court committed a clear error of judgment in the conclusion it reached upon weighing of the relevant factors." *SEC v. Coldicutt*, 258 F.3d 939, 941 (9th Cir. 2001).

The standard for determining whether to grant a stay pending appeal is similar to that applied by a district court when considering the issuance of a preliminary injunction. *Tribal Vill. of Akutan v. Hodel*, 859 F.2d 662, 663 (9th Cir. 1988). A preliminary injunction may be issued when the moving party demonstrates "either: (1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in [the moving party's] favor." *Lands Council v. Martin*, 479 F.3d 636, 639 (9th Cir. 2007) (*quoting Clear Channel Outdoor Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003)).

As noted by the majority, we are also required to consider "where the public interest lies" in certain cases. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *Taylor v. Westly*, 488 F.3d 1197, 1200 (9th Cir. 2007). I respectfully differ with the majority, however, concerning how the "public interest" consideration applies in this case. *Department of Navy v. Egan*, 484 U.S. 518 (1988), cited by the majority for the proposition

that "unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security matters," is distinguishable from the facts of this case. *Egan* involved the discharge of a Navy employee whose security clearance had been denied; it was not an environmental case. *Id.* at 522. The Supreme Court held that the authority to classify and control access to information bearing on national security and to determine which individuals have the right to access such information flows from the President's authority as Commander in Chief and exists apart from any explicit congressional grant. *Id.* at 527. It also noted a " 'compelling interest' in withholding national security information from unauthorized persons in the course of executive business." *Id.* But "public interest" considerations in environmental cases are very different from those in security clearance cases, and the military has long been required to comply with NEPA and numerous other environmental laws, *even though national security considerations have been involved. See, e.g.*, *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Commission*, 449 F.3d 1016, 1035 (9th Cir. 2006), and cases cited therein.

The majority also cites *Hilton v. Braunskill*, 481 U.S. 770 (1987), for the proposition that even " 'failing' a strong likelihood of success on the merits, the party seeking a stay may be entitled to prevail if it can demonstrate a 'substantial case on the merits' and the second and fourth factors militate in its favor." But *Hilton* was a habeas corpus case, not an environmental case, and deals with the standards for releasing a prisoner from confinement pending appeal. *Id.* at 775-76. The "public interest" considered in *Hilton* was whether the lower court could properly take the dangerousness of the habeas petitioner into account as part of its decision whether to release the petitioner pending appeal. *Id.* at 777. The court concluded that the court may do so, despite the traditional preference for release. *Id.* at 778. The "public interest" in this case is very different and constitutes a weighing between the

"national security" public interest advocated by the Navy versus the environmental "public interest" advocated by the Appellees. *Hilton* does not, in my view, permit this court to decline to consider the requirement that the Navy show a probability of success on the merits in order to grant a stay of the district court's injunction.

1. The Navy fails to meet its burden of showing probability of success on the merits and fails to raise serious questions going to the merits of this case. Although Congress could easily include a national security exemption in the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347, it has not done so. As we stated in *San Luis Obispo Mothers for Peace*, 449 F.3d at 1035, "[t]here is no 'national defense' exception to NEPA . . . . The Navy, just like any federal agency, must carry out its NEPA mandate to the fullest extent possible and this mandate includes weighing the environmental costs of the [project] *even though the project has serious security implications*." *Id.* (*quoting No GWEN Alliance v. Aldridge*, 855 F.2d 1380, 1384 (9th Cir. 1988)) (internal quotation marks omitted) (emphasis added). The Navy's Environmental Assessment ("EA") reports that the planned SOCAL exercises may result in approximately 170,000 "takes" of marine mammals and, according to the district court's order, may include "approximately 8,000 exposures powerful enough to cause a temporary threshold shift in the affected mammals' sense of hearing and an additional 466 instances of permanent injury to beaked and ziphiid whales." Our holding in *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998), instructs that in order for the plaintiffs to prevail on a claim that the Navy must prepare an Environmental Impact Statement ("EIS") for the SOCAL exercises, "a plaintiff need not show that significant effects will in fact occur. It is enough for the plaintiff to raise substantial questions whether a project may have a significant effect on the environment." *Id.* at 1212 (internal quotation marks and citations omitted). The district court found that the Navy's EA and other evidence had shown to a "near certainty

that the use of MFA sonar during planned SOCAL exercises will cause irreparable harm to the environment and to plaintiffs' declarants." Accordingly, it appears at this stage of the proceedings that the Navy will have to prepare an EIS before it engages in its training exercises within the SOCAL area. 42 U.S.C. § 4332(2)(C); *Native Ecosystems Council v. United States Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005). The Navy has not yet prepared an EIS, and it has not yet offered any legally viable defense to the EIS preparation requirement.

Similarly, the Navy failed to submit its sonar activities for a consistency determination to the California Coastal Commission ("CCC") as required by the Coastal Zone Management Act ("CZMA"), 16 U.S.C. §1456(c)(1), and then refused to comply with the Commission's proposed mitigating measures, some of which are the same mitigation measures employed by the Navy from mid-2006 to January of 2007. As with NEPA, the Congress created no national security exemption to the CZMA, and the Navy appears to be in violation of the CZMA. *See id.* The Navy has not yet offered any legally viable defense to its failure to comply with CZMA.

Accordingly, the Navy has not met its burden of showing probability of success on the merits and fails to raise serious questions going to the merits of this case. The majority does not address this required prong of the test the Navy must meet in order to obtain a stay. *Hilton* does not apply here, but even if it did, the Navy still cannot meet its burden to show that it has a "substantial case on the merits," as *Hilton* requires.

2. The Navy also fails to show that it will suffer irreparable harm if the stay is not granted or that the balance of hardships tips sharply in its favor. It also fails to make the case for a compelling public interest that overrides the Navy's probable violations of NEPA and CZMA. From mid-2006 to January of 2007, the Navy used a set of environmental mitigation measures for all MFA sonar exercises other than RIMPAC. It adopted similar measures when it conducted MFA sonar exer-

cises as part of the 2006 RIMPAC near Hawaii, and added additional protections for planned chokepoint and isobath exercises. From mid-2006 to January of 2007, the Navy did not operate MFA sonar within twelve nautical miles of the coast. From mid-2006 to January of 2007, the Navy enlarged the safety zone for marine mammals when certain significant surface ducting conditions existed. From mid-2006 to January of 2007, the Navy followed certain procedures during low visibility conditions, whereby if detection of a marine mammal was not possible out to the prescribed safety zone, the Navy would power down sonar if marine mammals were present in the zones it could not use. From mid-2006 to approximately January of 2007, the Navy provided focused monitoring for mammals before, during and after chokepoint exercises.

And yet, commencing some time in early 2007, without providing convincing (or in some cases, any) evidence compelling its change in policy, the Navy has declined to continue employing the referenced environmental mitigation measures it used from mid 2006 to January of 2007, let alone been willing to adopt the further measures sought by the CCC, that would likely have permitted it to conduct exercises in the SOCAL range.

There is no "national security trump card" that allows the Navy to ignore NEPA to achieve other objectives. By declining to write a national security exemption into NEPA, Congress has evidently concluded that it does not jeopardize national security to require the military to comply with NEPA, and the courts have agreed. *See e.g.*, *San Luis Obispo Mothers for Peace*, 449 F.3d at 1035. Moreover, unless someone can demonstrate that the Navy jeopardized our national security and failed to properly train our involved military personnel by adopting the referenced environmental mitigation measures during the period from mid-2006 to January 2007, it is hard to imagine why implementing some of those same environmental mitigation measures now would do so, espe-

cially if doing so would open the possibility of training within the SOCAL range.

3. As further evidence that neither the Navy nor national security will suffer irreparable harm or that the public interest will be harmed by leaving the district court's preliminary injunction in place *pendente lite*, the Navy has already completed three of its fourteen planned SOCAL exercises scheduled from February 2007 to January 2009. Even more importantly, given the limited language and scope of the injunction, the Navy is free to proceed at any time with its MFA sonar training exercises *outside* the SOCAL area that are similar to the conditions in the SOCAL area. The majority says this is unpersuasive because the Navy claims "there is no duplicative location where land, sea, undersea and airspace assets are controlled by military authorities that allow full play and training by THIRD Fleet operational actors." But the district court already considered this contention by the Navy and found as follows at the hearing for the preliminary injunction:

> What is not clear from the papers nor was it ever fully addressed in the question of the Hawaii exercises is the fact that this is not the only place in the world where this kind of testing can go on.
>
> . . .
>
> *There is nothing before me to indicate there are not other places in the world where this testing could go on.* And, in fact, in the larger lawsuit, the court has evidence that, in fact, testing is going on all over the world all the time.
> (emphasis added).

In making these findings, the district court considered the same classified documentation we did, as well as a far more extensive set of documents and studies. We traditionally defer

to the findings of the district court concerning matters of fact. This should particularly be true here where much of the counter documentation of the appellees is not before us as it was before the district court.

4.   Unlike my colleagues in the majority, I am satisfied that the district court carefully weighed national security and public interest considerations before issuing the preliminary injunction in this case. The record shows that the district court reviewed certain documentation pertaining to national security matters in camera prior to issuing its injunction. The court transcript also shows clearly that the court carefully considered national security interests before issuing its injunction.

> Well, let [me] say *it is clear from your papers and from everything that I have read that the MFA active sonar testing is important. It's critical to national security*. I have absolutely no problem with that concept or the reality of it.

> What is not clear from the papers nor was it ever fully addressed in the question of the Hawaii exercises is the fact that this is not the only place in the world where this kind of testing can go on.

> . . .

> There is nothing before me to indicate there are not other places in the world where this testing could go on. And, in fact, in the larger lawsuit, the court has evidence that, in fact, testing is going on all over the world all the time.

> *So while I recognize the significance of saying these fourteen exercises cannot be conducted the way they've been proposed, which is with little or no mitigation, it does not mean that there will be no active*

*MFA sonar testing for our Navy.* That's not the result here.

. . .

*The issues are tremendously important, and it's never easy to balance something as significant as safety to wildlife with issues that may hinge on national security and injury or harm to the Navy.*

I remain satisfied that the plaintiffs have established to a near certainty that the use of MFA sonar during planned SOCAL exercises will cause irreparable harm to the environment and to plaintiffs' declarants.

*The court is satisfied the balance of hardships tips in favor of granting the injunction as harm to the environment, plaintiffs, and the public interest outweighs harm to the defendants if they were prevented from using MFA sonar in Southern California during these exercises without effective mitigation measures.*

(emphasis added).

In light of the district court's actions and statements, I find no abuse of discretion merely because the words "national security" do not appear in the district court's order granting the injunction. I also respectfully note that it is the Navy that has rejected mitigation measures, not the district court or the plaintiffs.

The district court did not abuse its discretion in handing down its preliminary injunction, and I respectfully dissent.

I do concur with the majority that this case should be heard by a merits panel of our court at the earliest possible date. I

also concur in the granting of plaintiff's motion to strike the "Unclassified Declaration Addendum of David Yoshira."